36 N.J. 561 (1962)
178 A.2d 185
FIDELITY UNION TRUST COMPANY, A NEW JERSEY CORPORATION, AS TRUSTEE UNDER THE LAST WILL AND TESTAMENT OF PETER F. FLOOD, DECEASED, AS ADMINISTRATOR C.T.A. OF THE ESTATE OF ELIZABETH G. FLOOD, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF MABEL G. CROSSMAN, DECEASED, PLAINTIFF-RESPONDENT,
v.
HENRY F. ROBERT, INDIVIDUALLY AND AS EXECUTOR OF THE LAST WILL AND TESTAMENT OF GRACE F. ROBERT, DECEASED, DEFENDANT-RESPONDENT, AND EDWARD F. CAVANAGH, JR., AS EXECUTOR OF THE LAST WILL AND TESTAMENT OF EDITH FLOOD CAVANAGH, DECEASED, AND PETER F. CROSSMAN, DEFENDANTS-APPELLANTS.
The Supreme Court of New Jersey.
Argued December 19, 1961.
Decided February 19, 1962.
*563 Mr. Marshall Crowley argued the cause for the defendant-appellant Edward F. Cavanagh, Jr., as executor, etc. (Messrs. Brogan & Wolff, attorneys; Mr. Henry F. Wolff, Jr., of counsel).
Mr. William H. Osborne, Jr., argued the cause for the defendant-appellant Peter F. Crossman (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Alfred C. Clapp argued the cause for the respondent Henry F. Robert, individually, etc. (Messrs. Clapp & Eisenberg, attorneys).
*564 The opinion of the court was delivered by JACOBS, J.
This is a will construction case in which the Appellate Division filed a comprehensive opinion. See Fidelity Union Trust Co. v. Robert, 67 N.J. Super. 564 (App. Div. 1961). We granted certification on applications by Peter F. Crossman and Edward F. Cavanagh, Jr., executor of the estate of Edith Flood Cavanagh.
Since the pertinent provisions of the will and the attendant circumstances, as well as the later factual occurrences and legal proceedings, are sufficiently set forth in the Appellate Division's opinion, we shall not restate them here except to such limited extent as may be found necessary. Nor shall we deal at any length with issues which have been disposed of to our satisfaction by the Appellate Division. Thus we need do little more than express agreement with its holding that, under the circumstances, the affidavit by Peter F. Crossman (submitted by consent in lieu of testimony), was admissible in evidence and was properly to be considered insofar as it furnished information as to the situation surrounding the testator Peter F. Flood at the time he executed his will. See 67 N.J. Super., at p. 573; cf. In re Fox, 4 N.J. 587, 594 (1950); Zwoyer v. Hackensack Trust Co., 61 N.J. Super. 9, 12 (App. Div. 1960); 5 N.J. Practice (Clapp, Wills and Administration) §§ 191, 196, 198 (3d ed. 1962). Similarly we express agreement with its position that the judicial function in construing the will was to ascertain and give effect to the "probable intention of the testator." See 67 N.J. Super., at p. 572; cf. Bank of New York v. Black, 26 N.J. 276, 286 (1958); In re Klein, 36 N.J. Super. 407, 419 (App. Div. 1955) (concurring opinion); and Simes and Smith, The Law of Future Interests, § 465, p. 452 (2d ed. 1956), where the authors point out that "when we say we are determining the testator's intent, we mean his probable intent." See also Morristown Trust Co. v. McCann, 19 N.J. 568, 572 (1955).
It may here be noted that, in ascertaining the subjective intent of the testator, courts will give primary *565 emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. See Zwoyer v. Hackensack Trust Co., supra, 61 N.J. Super., at pp. 12, 16; Greene v. Schmurak, 39 N.J. Super. 392, 400-401 (App. Div. 1956), certif. denied 21 N.J. 469 (1956); Shepherd v. Peratino, 86 U.S. App. D.C. 395, 182 F.2d 384 (D.C. Cir. 1950); 2 Powell, Real Property, § 325 (1950); Simes and Smith, supra, § 844; cf. Busch v. Plews, 12 N.J. 352, 358 (1953). So far as the situation fairly permits, courts will ascribe to the testator, "those impulses which are common to human nature, and will construe the will so as to effectuate those impulses." See Greene v. Schmurak, supra, 39 N.J. Super., at p. 400; cf. Murphy v. Murphy, 118 N.J. Eq. 108, 112 (Ch. 1935), affirmed 119 N.J. Eq. 83 (E. & A. 1935); Coyle v. Donaldson, 91 N.J. Eq. 138, 140 (E. & A. 1919); Bank of New York v. Black, supra, 26 N.J., at p. 285. In the Black case, this court had recent occasion to determine whether a residuary bequest by the testatrix to her daughter of "all my estate" was intended to pass property which was not literally part of her estate but over which she had a general power of appointment. We held that it did and, in the course of his opinion for the court, Justice Wachenfeld expressed high-purposed principles which should have application in the construction of all wills. He pointed out that the goal always is the ascertainment of the testator's intent and it is not to be thwarted by unduly stressing "the literal meaning" of his words (see 26 N.J., at p. 284; cf. Bottomley v. Bottomley, 134 N.J. Eq. 279, 290-291 (Ch. 1944)); that the object is to ascertain "the probable intent" of the testator by a "preponderance of the evidence" and to carry it out in accordance with his wishes "even though they be imperfectly expressed" (see 26 N.J., at p. 286; cf. In re Klein, supra, 36 N.J. Super., at p. 419); and that the court's endeavor is to put itself in the testator's position insofar as possible in the effort to accomplish what *566 he would have done had he "envisioned the present inquiry." See 26 N.J., at p. 287; cf. Simes and Smith, supra, § 466. In his search for the intent of the testatrix, Justice Wachenfeld extensively reviewed the background and surrounding circumstances and expressed the court's conclusion "from the whole record" that the testatrix intended to and did pass to her daughter the property over which she had the power of appointment. See 26 N.J., at pp. 289-294.
The readiness, as indicated by Black, to strain towards effectuating the probable intent of the testator, represents a wholesome judicial attitude which finds ample expression in adjudications here and elsewhere. See Watson v. Brower, 24 N.J. 210, 215 (1957); Zwoyer v. Hackensack Trust Co., supra, 61 N.J. Super., at p. 12; In re Upjohn's Will, 304 N.Y. 366, 107 N.E.2d 492, 495 (Ct. App. 1952); Shepherd v. Peratino, supra, 182 F.2d, at p. 386. Earlier cases where the courts carried forth the testator's probable intent, even though it meant departing from the literal terms of the will, may be found among the decisions cited by Judge Clapp in In re Devries, 36 N.J. Super. 29, 35 (App. Div. 1955), and by Vice-Chancellor Woodruff in Bottomley v. Bottomley, supra, 134 N.J. Eq., at p. 291. In the Bottomley case the Vice-Chancellor said:
"The power of this court to effectuate the manifest intent of a testator by inserting omitted words, by altering the collocation of sentences, or even by reading his will directly contrary to its primary signification is well established. This power, when necessary, is exercised to prevent the intention of the testator from being defeated by a mistaken use of language. The question presented is simply this: Will the court execute the clear intent of the testator not fully or clearly expressed in a will, or will it by a strict technical adherence to the form of words and their literal meaning suffer the intention of the testator to be defeated? Scarborough v. Scarborough (Court of Chancery), 134 N.J. Eq. 201; Van Houten v. Pennington (Court of Errors and Appeals), 8 N.J. Eq. 745, 749. In the exercise of this power and the discharge of its responsibility, this court has frequently construed technical legal words contrary to their technical meaning. Some of those cases are: Den ex dem. Blackwell v. Blackwell (Supreme Court), 15 N.J. Law 386; Stokes *567 v. Tilly (Court of Chancery), 9 N.J. Eq. 130; Aitken v. Sharp (Court of Chancery), 93 N.J. Eq. 336, 346; 115 Atl. Rep. 912; Campbell v. Cole (Court of Chancery), 71 N.J. Eq. 327; 64 Atl. Rep. 461; affirmed, 73 N.J. Eq. 384; 67 Atl. Rep. 1052; First National Bank v. Levy (Court of Chancery), 123 N.J. Eq. 21; 195 Atl. Rep. 820, application to amend decree denied, 126 N.J. Eq. 493; 9 Atl. Rep. (2d) 789; affirmed 130 N.J. Eq. 220; 21 Atl. Rep. (2d) 788."
See In re Fabbri's Will, 2 N.Y.2d 236, 240, 159 N.Y.S.2d 184, 187, 140 N.E.2d 269 (Ct. App. 1957).
This liberal judicial attitude finds comparable expression in the many recent cases in our State which have dealt with the construction of other instruments such as contracts and legislative enactments. See, e.g., Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953); Tessmar v. Grosner, 23 N.J. 193, 201 (1957); Dvorkin v. Dover Tp., 29 N.J. 303, 313 (1959); State v. Provenzano, 34 N.J. 318, 322 (1961). It is sometimes said that courts have less latitude in the construction of these other instruments than they have in the construction of wills (see Wise v. Potomac Nat. Bank, 393 Ill. 357, 65 N.E.2d 767, 771 (Sup. Ct. 1946); 4 Page on Wills 8 (Bowe-Parker Revision 1961); cf. 5 Clapp, supra, § 196, p. 303); in construing these other instruments, courts may be confronted with significant problems of reliance and the troublesome goal of effectuating the common intent of different parties whereas in the construction of wills, there are fewer problems of reliance and the goal is the effectuation of the intent of the testator alone. See 4 Page on Wills, supra, at pp. 2, 7; Simes and Smith, supra, § 462; cf. Corbin, Contracts, § 538 (1960). Nevertheless, in construing contractual instruments, our courts will broadly search for the probable common intent of the parties, will consider their relations, the attendant circumstances and the objectives they were trying to obtain, and will endeavor to find a reasonable meaning "in keeping with the express general purpose." See Tessmar v. Grosner, supra, 23 N.J., at p. 201. In construing legislation, our courts will with equal breadth search for the probable legislative intent and endeavor *568 to find a reasonable meaning in keeping with the legislative goal. See Dvorkin v. Dover Tp., supra, 29 N.J., at p. 313; City of Clifton v. Zweir, 36 N.J. 309 (1962). When the probable intent is made manifest, any language which may read literally to the contrary must give way. See Lloyd v. Vermeulen, 22 N.J. 200, 205 (1956); Caputo v. Best Foods, 17 N.J. 259, 264 (1955); In re Roche, 16 N.J. 579, 587 (1954); cf. Alexander v. N.J. Power & Light Co., 21 N.J. 373, 378 (1956), where Justice Heher noted that statutory words "may be expanded or limited according to the manifest reason and obvious purpose of the law." See also Corrigan v. Gassert, 27 N.J. 227, 238 (1958); New Capitol Bar & Grill Corp. v. Div. of Employment Sec., 25 N.J. 155, 160 (1957).
Since the goal is the ascertainment of the testator's probable intent in this particular will construction case, precedents involving the construction of other wills have no great force. See Greene v. Schmurak, supra, 39 N.J. Super., at p. 399; Hicks v. Jones, 138 N.J. Eq. 280, 283 (Ch. 1946); 5 Clapp, supra, § 191, p. 280; cf. 4 Page on Wills, supra, § 30.5. Similarly, canons of construction which are largely designed to serve as aids in ascertaining the testator's probable intent have no controlling force. See Greene v. Schmurak, supra, 39 N.J. Super., at p. 400; 4 Page on Wills, supra, § 30.2, p. 7; cf. In re Fabbri's Will, supra, where the court pointed out that "all rules of interpretation are subordinated to the requirement that the actual purpose of the testator be sought and effectuated as far as is consonant with principles of law and public policy." 2 N.Y.2d, at pp. 239-240, 159 N.Y.S.2d, at p. 187. In City of Clifton v. Zweir, supra, Justice Hall, in dealing with the interpretation of a legislative enactment, made comments which have some pertinence here. He noted that the goal is to ascertain the intent of the Legislature and that all canons of construction are subservient to that goal; that the issue may not be resolved by "mechanically selecting and applying a canon or maxim of statutory construction"; *569 and that while there are undoubtedly recurrent references to the canons, there are variant canons which may often be used to cancel each other. See Llewellyn, The Common Law Tradition: Deciding Appeals 521 (1960); cf. 5 Clapp, supra, § 203, pp. 330-333; Simes and Smith, supra, § 468.
Peter F. Flood's will was executed on April 15, 1905 and he died on April 5, 1906. He was survived by his wife Elizabeth, four daughters, Mabel, Margaret, Edith and Grace, a grandson Peter F. Crossman, who was the son of Mabel and was then 15 years of age, and a grandson Henry F. Robert, who was the son of Grace and was then a baby. When the will was executed Mabel had already divorced her husband and she and her son had gone to live with her parents. Mr. Flood treated his grandson Peter as a son and wanted to adopt him. He sent him to Newark Academy and planned to send him to Princeton. Mabel never remarried and Margaret never married. Edith and Grace were married about 1903. Edith never had any children and Grace's only child was Robert who was born about 1904 or 1905. Mr. Flood had "a horror about women having money," believed that they should have "an adequate income" but was afraid that their husbands "would separate them from any principal they had." He had a "very low regard" for his sons-in-law and his overriding concern was for "the happiness and well-being of his wife, children and grandchildren."
His will furnishes ample evidence of this concern and of his deliberate efforts to discharge it fully. After directing, in the first paragraph, that his debts and funeral expenses be paid, he gave, in the second paragraph, all of his property to his executors and trustees to pay the income to his wife Elizabeth for life; upon her death, one-fourth of the income was to be paid to each of his four daughters; upon the death of any daughter leaving issue surviving, the income was to be paid to the issue until they attained 21; and upon reaching that age the issue were to be paid the one-fourth share of the estate. In the third paragraph of *570 his will Mr. Flood sought to take care of contingencies other than the normal course of successive deaths of the daughters leaving issue, as anticipated in the preceding paragraph:
"In the event of the death of any one of my daughters without leaving issue her surviving, it is my will and I direct that the one-fourth share of the income bequeathed to each, shall be paid to the surviving daughter or daughters, in equal shares, and in the event of the death of any one of the children of any one of my daughters, that the share of the one-fourth of the income of my estate of such deceased child shall be paid to the surviving brothers and sisters of such deceased child, and in the event of the death of all the children of any one of my daughters before attaining the age of twenty-one years, without leaving lawful issue, that then the share which such child or children would have received shall be paid to the child or children of any one or all of the surviving of my said daughters."
When Mabel died in 1931 leaving her son Peter, then over 21, the remaining trustee administering the trust turned over one-fourth of the estate to Peter. Thereafter Margaret, Edith and Grace each received one-third of the income until the death in 1936 of Margaret who died without issue. After Margaret's death, Edith and Grace shared all of the income until Edith died in 1958 without issue. All parties concede that following Edith's death, and until her own death in 1959, Grace was entitled to receive all of the income, with the possible exception of the one-sixth share of the income which became additionally payable to Edith following the death of Margaret. As to that one-sixth share, the executor of Edith's estate contends that it never became payable to Grace but passed to Edith's estate. The Appellate Division rejected this contention and we agree with its action. See 67 N.J. Super., at pp. 584-586. The design of the will sufficiently evidences the testator's broad general purpose that where, as here, daughters died without issue, their income was to be distributed among the surviving daughters. Thus after Margaret's death Edith and Grace properly shared the income including Margaret's income. In effectuation of the testator's purpose, Grace was entitled after Edith's death without issue, to Edith's income. *571 Nothing in the plan of the will or in the attendant circumstances suggests that the additional one-sixth income which Edith received following Margaret's death was to be dealt with differently than her other income. On the contrary, when the will is read in the light of the family background, it gives fair indication that there was to be no such differentiation and that the testator's desires would be sympathetically fulfilled by payment of the income from the estate to the surviving daughter Grace to the exclusion of the husband or estate of the daughter Edith who died without issue. See 67 N.J. Super., at pp. 585-586.
When Mabel died in 1931 leaving her son Peter, then over 21, Peter was properly given a one-fourth share of the original trust corpus of the estate. When Grace died in 1959 leaving her son Henry, then over 21, Henry became entitled to a one-fourth share. This much was not disputed but a dispute did arise as to the remaining two-fourths of the corpus which did not go in normal course to issue of Margaret and Edith because they died without issue. The trial court held the two-fourths of the corpus passed by intestacy. This position was rejected by the Appellate Division which held that they were disposed of by the final clause of the third paragraph of the will which directed "in the event of the death of all children of any one of my daughters before attaining the age of twenty-one years, without leaving lawful issue, that then the share which such child or children would have received shall be paid to the child or children of any one or all of the surviving of my said daughters." We agree with the Appellate Division that the testator intended to leave his estate to his wife, his children and their issue, that he did not intend to die intestate but attempted to take care of all contingencies, and that the final clause of the third paragraph may be read liberally as referring to the corpus in dispute. See 67 N.J. Super., at pp. 574-576; cf. In re Fabbri's Will, supra, 2 N.Y.2d, at p. 243, 159 N.Y.S.2d, at p. 190:
*572 "A testator, by the act of the making of a will, casts grave doubt on any assumption that he expressly intends to chance dying intestate as to any portion of his property. Indeed, the law has taken cognizance of this teaching of common experience and crystallized it into a presumption, expressed in various terms, but requiring essentially that the courts favor a construction which avoids partial intestacy and adopt one which results in a complete disposition of the estate. Haug v. Schumacher, 166 N.Y. 506, 514-515, 60 N.E. 245, 246, supra; Lewis v. Howe, 174 N.Y. 340, 346, 66 N.E. 975, 977, 1101. This presumption against intestacy is particularly weighty where the gift, as here, is made out of the residuary estate. Matter of Hayes' Will, 263 N.Y. 219, 225, 188 N.E. 716, 718. The opinion in the Hayes case, 263 N.Y., at page 225, 188 N.E., at page 718, quotes the following forceful statement of the rule: `The idea of anyone deliberately purposing to die testate as to a portion of his estate and intestate as to another portion is so unusual in the history of testamentary disposition as to justify almost any construction to escape it. 2 Redfield on Wills (3d Ed.) 235.'"
See Barrett v. Barrett, 134 N.J. Eq. 138, 142 (Ch. 1943); Bankers Trust Co. of N.Y. v. Greims, 115 N.J. Eq. 102, 114 (Ch. 1934), affirmed 117 N.J. Eq. 397 (E. & A. 1935).
In the prior clauses of the third paragraph the testator expressly referred to income whereas in the final clause there was no express reference to income. After setting forth the contingency of the death of all of a daughter's children without issue and before attaining 21, the testator referred to the "share" which the children "would have received." In its context and background, we may readily gather from this language, as did the Appellate Division, that the testator had in mind the share of the corpus which the children would have received if they had attained 21. See 67 N.J. Super., at p. 576. Although the final clause expressly referred to the death of a daughter whose children died before attaining 21, it did not expressly refer to the death of a daughter who never had any children. The Appellate Division found that the clause applied equally to the latter contingency and we agree. See 67 N.J. Super., at p. 579. It is entirely evident that when the testator made provision for the situation in which a daughter *573 died leaving children who never attained 21, he intended the identical provision to apply when the daughter died without ever having had any children. This intention should be fulfilled and it matters little whether the situation fits strictly within traditional gifts by implication (see Russell v. Russell, 16 N.J. Super. 589, 592 (App. Div. 1951); cf. In re Wainwright's Estate, 376 Pa. 161, 101 A.2d 724 (Sup. Ct. 1954)) or within comparable precedents (see 67 N.J. Super., at p. 579) which in the ultimate rest on the judicial willingness to effectuate the intent of the testator.
After reaching its conclusion that the final clause of the third paragraph applied to corpus, the Appellate Division determined that the two-fourths share of the original corpus was to go to Henry to the exclusion of Peter (see 67 N.J. Super., at pp. 579-584); this determination leads to the unequal and rather startling result that Peter, the grandchild who lived with the testator and was always treated by him as a favored son, is to receive no more of the corpus than the one-fourth he received upon his mother's death whereas Henry, the other grandchild, who never lived with the testator and was but an infant when the testator died, is to receive the remaining three-fourths of the corpus. In support of its determination the Appellate Division relied on the language in the final clause which set forth that if the children of a deceased daughter died before they reached 21 the share the children would have received was to be paid to the child or children of any one or all of "the surviving of my said daughters"; it took the position that the word "surviving" should be given its "ordinary meaning" and that consequently Henry was entitled to the "undistributed corpus of the trust." See 67 N.J. Super., at p. 584. That the testator would have rejected this disposition if he had "envisioned the present inquiry" (Bank of New York v. Black, supra, 26 N.J., at p. 287) would appear to be beyond question.
*574 Although the Appellate Division cited New Jersey cases in which the word "survivor" was actually given its literal meaning, those cases recognized that such meaning would be departed from when necessary to carry out the intent of the testator as it appeared from "the whole will." See Stout v. Cook, 79 N.J. Eq. 573, 576 (E. & A. 1911); cf. Van Nest v. Van Nest, 126 N.J. Eq. 234 (E. & A. 1939); Cuskaden v. Steelman, 88 N.J. Eq. 554 (E. & A. 1918); Ashhurst v. Potter, 53 N.J. Eq. 608 (Ch. 1895), affirmed 54 N.J. Eq. 699 (E. & A. 1896). In recent days this court has shown increased readiness to search for and effectuate the probable intent of the testator as it may be gathered from the will when read sympathetically in the full light of the family background and the attendant circumstances. See Bank of New York v. Black, supra; cf. Zwoyer v. Hackensack Trust Co., supra; In re Fabbri's Will, supra; 2 Powell, supra, § 325, p. 713. There have been decisions in other states in which the word "survivor" was construed to mean "other" in order to fulfill the testator's probable intent; they are cited in Simes and Smith, supra, § 774, where the authors note that they are difficult to classify and are evidenced by a marked judicial tendency "to decide each case on its own peculiar facts." See In re Fox's Estate, 222 Pa. 108, 70 A. 954 (Sup. Ct. 1908); Balch v. Pickering, 154 Mass. 363, 28 N.E. 293 (Mass. Jud. Ct. 1891); cf. 3 Jarman, Wills 1961 et seq. (8th ed. 1951); see also 5 Clapp, supra, § 220, p. 373.
In In re Fox's Estate, supra, the testator left his property in trust to pay one-fourth of the income to each of his four daughters and on the death of a daughter leaving issue the principal was to go to such issue. On the death of a daughter without issue her share was to be held in trust for "her surviving sisters in the same and like manner." Two of the sisters died with issue and the third, Hannah, died without issue, leaving Catherine as the sole surviving sister. Catherine's trustee claimed all of Hannah's share *575 for Catherine as the "surviving" sister but the court rejected this claim holding that Hannah's share would be divided into three equal parts for distribution among the "other" sisters, Catherine being represented by her trustee and the sisters who predeceased Hannah being represented by their issue. After noting that the honoring of Catherine's claim as the "surviving" sister to all of Hannah's share would not be in harmony with the general intent and scheme of the testator, Chief Justice Mitchell, speaking for the Pennsylvania Supreme Court, had this to say:
"He treated all his daughters alike, and gave each one-fourth of his estate for life, with remainder to her issue. Not one of them was vested with power to break the succession of her issue in remainder, and nowhere is there any indication that he intended to make any distinction among his descendants of the second generation as to their ultimate share in his estate. That the issue of a sister dying first should thus be cut off from participation in the share of a sister dying subsequently without issue would be giving an accidental and irrelevant fact an effect contrary to the manifest general intent, and an exercise of the power withheld from the daughters themselves. As said by the auditing judge below: `It is well settled, however, that the word "survivor," or "surviving," will be understood as the equivalent of "other," where in any other sense it would lead to an intestacy, or to inequality among those standing in the same degree of relationship to the testator, or to a distribution not in accordance with the general scheme of the will in its entirety. Lapsley v. Lapsley, 9 Pa. 130; Williams on Executors, 1577; Theobald on Wills, 355. See, also, Vance's Estate, 11 Pa. Dist. R. 197, s.c. 209 Pa. 561, 58 Atl. 1063; Park's Estate, 21 Wkly. Notes Cas. 227; Hubbert's Estate, 6 Pa. Dist. R. 96; Vogdes's Estate, 16 Pa. Dist. R. 377; Lewis' Appeal, 18 Pa. 318,' etc.
It is not necessary to resort to the artificial and arbitrary construction that `survivors' meant survivors at the testator's death. The time in testator's mind was clearly the death of each daughter dying without issue; but he did not mean to make shares of any group of his grandchildren dependent on the accident of their mother's survival of her childless sister. The word `other' very clearly expresses his general intent, and that is the sense in which he used the word `survivors.'" 70 A., at p. 955
As in In re Fox's Estate, supra, we consider that the honoring of Henry's claim to three-fourths of the corpus would disregard "the general intent and scheme of the *576 testator." 70 A., at p. 955. It may be assumed that ordinarily a testator's goal is to have equality between equally situated objects of his bounty. See Kennedy v. Mockler, 38 N.J. Super. 35, 51 (App. Div. 1955); Tourigian v. Tourigian, 29 N.J. Super. 94, 98 (Ch. Div. 1953); Armstrong v. Hyde, 28 N.J. Super. 536, 541 (Ch. Div. 1953); Curtis v. Safe Deposit & Trust Co. of Baltimore, 178 Md. 360, 13 A.2d 546, 548 (Ct. App. 1940); Oliver v. Oliver, 286 Ky. 6, 149 S.W.2d 540, 542 (Ct. App. 1941); 4 Page on Wills, supra, § 30.12, p. 90. The overall terms of Mr. Flood's will, tend to confirm rather than deny this goal. They indicate that, in all probability, he intended to treat all branches of his family alike, to have the income go to his daughters as a class, and to have the corpus go to his grandchildren as a class, subject to their having survived their mothers and attained 21. While acknowledging that the testator's "initial thought" probably was to treat all branches of his family alike, the Appellate Division noted that in certain circumstances the testator "anticipated an inequality among the stocks of his family." See 67 N.J. Super., at p. 580. It made reference to the fact that upon the death of a daughter without issue, the surviving daughters thereafter received greater income during their lives but that circumstance was not inconsistent with the testator's design that there be equal treatment among those equally situated. We need not be concerned with the situation suggested by the Appellate Division in which children of daughters dying later might enjoy a greater share of income "should their mother die before they reached 21 than would be enjoyed by the issue of another, prior deceased daughter, who died leaving issue." See 67 N.J. Super., at p. 581. That situation never did occur, was probably never given any consideration by the testator, and we are not now called upon or prepared to say whether his will would be judicially construed to produce the suggested inequality between minor grandchildren equally situated.
*577 We are satisfied that fulfillment of the design and plan of the testator's will, calls for equal distribution between Peter and Henry of the two-fourths of the corpus in dispute and that the pertinent language in the final clause of the third paragraph may fairly be interpreted to reach that result. To such extent the Appellate Division's judgment is modified but in all other respects it is affirmed.
Modified.
For modification  Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN  7.
Opposed  None.