228 N.J. Super. 68 (1988)
548 A.2d 1157
FRANCIS SHARPLESS, TRUSTEE UPPER EVESHAM PREPARATIVE MEETING AND EDWARD C. JENNINGS, TRUSTEE MEDFORD MONTHLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, JOSEPH B. ENGLE, PLAINTIFFS-APPELLANTS,
v.
MEDFORD MONTHLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, MIDLANTIC NATIONAL BANK, IRWIN KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 1988.
Decided October 5, 1988.
*71 Before Judges ANTELL, HAVEY and BROCHIN.
Judith Jennings, attorney for appellants (Judith Jennings on the briefs).
Wayne Partenheimer, attorney for respondent Medford Monthly Meeting of the Religious Society of Friends (Wayne Partenheimer on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney for respondent Attorney General of New Jersey (William P. Malloy, Deputy Attorney General, on the letter brief).
Respondent Midlantic National Bank's brief was suppressed.
The opinion of the court was delivered by HAVEY, J.A.D.
Plaintiffs appeal from a final judgment permitting defendant Medford Monthly Meeting of the Religious Society of Friends (Medford Meeting) to combine graveyard trust funds and to apply part of the trust income for meeting purposes other than the maintenance of graveyard sites. The issue raised is whether the doctrine of cy pres may be applied to the surplus trust income so as to permit Medford Meeting, as trustee, to utilize the surplus for general meeting purposes. We conclude that the doctrine does apply and therefore affirm.
*72 Plaintiff Francis Sharpless was a member of the former Upper Evesham Preparative Meeting (Union Street Meeting), a Quaker preparative meeting which owned a meeting house and graveyard situate on Union Street in Medford. Plaintiffs Edward C. Jennings and Joseph B. Engle were members of the former Medford Preparative Meeting of Friends (Main Street Meeting), which owned and maintained a meeting house and graveyard on Main Street in Medford. Both meetings existed as separate entities prior to 1971 because of a doctrinal schism which existed within Quakerism.
The Union Street Meeting established a graveyard fund in 1911 by soliciting contributions from members to care for and maintain its graveyard. A trust for that purpose was created with the Burlington County National Bank of Medford in 1943. Thereafter, the trust received bequests and gifts which, according to Sharpless, were made for the specific purpose of maintaining the graveyard. In 1986, the trust had income of $18,412.57 and expenses of $1,376.34. As of January 26, 1987, the estimated market value of the Union Street graveyard trust was $177,026.01.
The Main Street Meeting graveyard fund was originated in 1922 when a specific bequest of $2,000 was made by the will of Elizabeth J. Shreve for the purpose of keeping the Main Street burial ground in good order "and any balance of income left over to assist in keeping the Meeting House and grounds ... in good order and repair." A trust was created in 1970 for the purpose of "the upkeep of the graveyard" with a proviso that if the meeting house was in need of repairs, monies could be used from the trust under carefully circumscribed conditions. In 1986, the Main Street trust produced income of $9,898.25 and incurred expenses of $934.73. As of January 26, 1987 the trust had a total value of $85,177.
In 1971, doctrinal differences between the meetings were resolved and they merged under the corporate charter of the Society of Friends of Medford, which later changed its name to *73 defendant Medford Monthly Meeting of the Religious Society of Friends. Medford Meeting adopted as its bylaws the Book of Faith and Practice, which in part recited the manner by which its trustees would retain meeting assets and administer meeting funds.
In 1985, Medford Meeting discussed the possibility of using the excess income from the two funds for purposes other than the maintenance of the two graveyards. Sharpless took an unbending position that the Union Street fund, which he administered, could not be used for any purpose other than the maintenance of the Union Street graveyard. Plaintiffs thereupon filed the present declaratory judgment action seeking permanent restraints and to determine the rights and obligations of the respective parties with respect to graveyard funds. Medford Meeting counterclaimed seeking a declaration that excess income could be used for general meeting purposes, that the two funds could be combined, and naming it as trustee of the combined funds.
After a bench trial, Judge Wells concluded that the two funds were charitable trusts, the principal purpose of which was to care for and preserve the Union and Main Street graveyards. Declining to apply the cy pres doctrine, the judge concluded that the probable intent of the donors of the respective funds was that excess income could be used for general church purposes other than graveyard maintenance. The judge thereupon appointed Medford Meeting trustee of the funds, permitted the combination of the funds for purposes of administration, and empowered Medford Meeting to use any excess income "for such other religious and charitable purposes as the Meeting, through its ... governing body may determine." He also ordered regular accountings of the trust, guided by the recommendations of a committee and by the Book of Faith and Practice.
On appeal, plaintiffs contend that use of excess income for general meeting purposes conflicts with the express intent of *74 the donors. They also argue that the facts do not support application of the cy pres doctrine, that use of excess income for general meeting purposes violates State public policy, and that there is no authority to permit the trustee to combine the separate trusts and decide what excess, if any, is available for general meeting purposes.
Judge Wells' broad construction of the probable intent of the donors to encompass use of excess funds for general meeting purposes is, in our view, supportable by substantial credible evidence on the record. See Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974). The Shreve bequest in 1922, for example, which created the Main Street fund, expressly provided for the use of excess income for repair of the Union Street meeting house, if necessary.
However, we are also satisfied that the judge's determination is sustainable by application of the equitable doctrine of cy pres. Cy pres is a judicial mechanism for the preservation of a charitable trust when accomplishment of the particular purpose of the trust becomes impossible, impracticable or illegal. Howard Savings Inst. v. Peep, 34 N.J. 494, 500 (1961). In re Crichfield Trust, 177 N.J. Super. 258, 261 (Ch.Div. 1980). If the settlor manifests an intent to devote the trust to a charitable purpose more general than the frustrated purpose, a court may apply the trust funds to a charitable purpose as similar as possible to the particular purpose of the settlor instead of allowing the trust to fail. Howard Savings Inst., supra, 34 N.J. at 500-501. If income from the charitable trust exceeds that which is necessary to achieve the donor's charitable objective, cy pres may be applied to the surplus income "since there is an impossibility of using the income to advance any of the charitable purposes of the settlor." See Bogert, Trusts & Trustees, (Rev. 2d Ed. 1977), § 438 at 554-555.
Here, no one disputes that the graveyard funds constitute charitable trusts. The particular purpose of the trusts, as found by Judge Wells, was to maintain and preserve the *75 respective graveyard sites. To the extent that the trust income exceeds maintenance and preservation costs, application of cy pres is appropriate since there is an impossibility of using the excess income to advance the particular charitable purpose expressed by the donors. Ibid.
The question then becomes whether the settlor manifested an intent to devote the excess income to a charitable purpose more general than maintenance and preservation of the graveyard sites. As Judge Wells correctly found, a general charitable purpose can be inferred. Since the donations were made for the perpetual maintenance of the graveyards, it is logical to conclude the donors expected excess income would be used, as the judge noted, "to strengthen the very institution to which [the donors] entrusted their money" to permit it to survive in perpetuity in order to carry out the donors' intent. A contrary result, that the income be held in each trust and accumulate in perpetuity for maintenance of the graveyards, is both illogical and contrary to the probable intent of the donors. The only sensible conclusion to be reached is that the donors did not intend that the trusts would grow while the meeting itself may cease to exist because of lack of funds. We are also convinced that use of the funds for general meeting purposes is sufficiently similar to the particular purpose of the settlors to apply the cy pres doctrine. Howard Savings Inst., supra, 34 N.J. at 501.
Plaintiffs also contend that "the public policy of this State" prohibits Medford Meeting from being the entity to decide whether there exists surplus income not needed for graveyard maintenance. Citing N.J.S.A. 16:1-7, plaintiffs argue that the Legislature has expressed an intent to preserve income generated from the operation of a cemetery for maintenance purposes only. However, N.J.S.A. 16:1-7 proscribes the use of monies received from the sale of burial plots for any use other than the care and maintenance of the burial grounds. Here, as Judge Wells properly concluded, Medford Meeting *76 does not intend to subdivide the graveyard sites and sell burial plots; nor is it authorized to do so. Thus, N.J.S.A. 16:1-7 is not applicable.
Plaintiffs also cite N.J.S.A. 8A:4-7 for the proposition that the Superior Court, and not the Medford Meeting trustees, has the exclusive power to decide what excess income, if any, is available for general meeting purposes. N.J.S.A. 8A:4-7 permits a cemetery company to receive testamentary trust income to be used for the care of a cemetery, but if the Superior Court determines that the trust provision is excessive, it may "fix in lieu thereof a reasonable sum." Here, Judge Wells was called upon to determine the probable intent of the donors, not whether the bequests and gifts were excessive. On the facts before us, N.J.S.A. 8A:4-7 provides no authority to place discretion as to use of the funds with the Superior Court, rather than with the Medford Meeting trustees.
In our view, vesting the discretionary power with the trustees rather than the Superior Court was a sensible and cost-saving device. In the absence of contrary evidence, the law presumes that a trustee intends to perform, rather than violate his duties, and that he will not misappropriate trust properties or funds. 76 Am.Jur.2d, Trusts, § 622 at 834 (1975). No one suggests that the trustees may act in bad faith or will be incapable of administering the trust. According to the judgment, the trustees are compelled to apply income in the first instance for care and preservation of the graveyard sites, and are prohibited from invading corpus for general meeting purposes. They are also duty-bound to follow the provisions of the Book of Faith and Practice which provide for yearly audits, inspection of the trusts by certified public accountants and appropriate committees, and the creation of a committee to assure that the burial grounds are kept in good order. We have no reason to conclude that the trustees will not adhere to that standard.
*77 For the same reasons, we cannot take issue with the judge's directive that the trust funds be combined for purposes of administration. The separate funds were vestiges of the doctrinal schism which no longer exists, and thus there is no apparent policy reason to keep the funds separate. Combining the funds provides a cost-saving method of administering the funds, subject to careful monitoring in accordance with the Book of Faith and Practice. Plaintiffs and other members of the Medford Meeting, of course, have their remedy if the trustees violate their fiduciary duties.
AFFIRMED.